

# THE ATTORNEY GENERAL
## OF TEXAS

AUSTIN 11, TEXAS

WAGGONER CARR
ATTORNEY GENERAL

February 3, 1966

Mr. Walter W. Broemer,
　Superintendent
Alabama-Coushatta Indian
　Reservation
Livingston, Texas

Opinion No. C-593

Re: Whether the Alabama-
　　Coushatta Indian Tribal
　　Members can create a
　　Public Housing Authority
　　as a separate corporate
　　entity to which the Com-
　　mission for Indian Affairs
　　and the Alabama-Coushatta
　　Indian Tribal Council could
　　make a forty-year lease of
　　State Trust Land to develop
Dear Mr. Broemer:　　　　　　　　a low-rent housing project.

　　　　Your letter of January 11, 1966, requesting our opinion
relative to the above captioned matter reads, in part, as follows:

　　　　"In reference to Opinion No. C-520, we
　　have proceeded in making application with
　　the Public Housing Administration for a Public
　　Housing Project on the Indian Reservation.
　　The Public Housing Administration finds that
　　they cannot provide the necessary funds for
　　low-rent housing because the Texas Commission
　　for Indian Affairs has the power to issue
　　bonds for a period of only twenty-five years.
　　Low-rent housing projects require forty-year
　　bonds.

　　　　"Therefore we would like to request the
　　opinion as follows:

　　　　"Can the Alabama-Coushatta Indian Tribal
　　Members create a Public Housing Authority as
　　a separate corporate entity to which the Texas
　　Commission for Indian Affairs and the Alabama-
　　Coushatta Indian Tribal Council could make a

-2862-

forty-year lease of State Trust Land to develop
a low-rent housing project."

In answering this question, it is necessary to review
certain legislative and congressional enactments. For a more
exhaustive historical summation, see Attorney General's Opinion
No. WW-43 dated March 5, 1957.

By an Act dated February 3, 1854 (4 Gammel 68) the
State of Texas provided funds and authority for the purchase of
1,280 acres of land for the Alabama Indians to be used by that
tribe as a home. The Commissioners appointed under this Act did
arrange for the purchase and conveyance to the tribe of Alabama
Indians of several tracts of land, and the deeds from the several
grantors specifically made reference to the Act of 1854. Thus
to accurately determine the nature of the estate conveyed, we
must construe the deeds and the Act together.

Section 3 of 1854 Act provides, in part, as follows:

". . .and that said Indians shall not
alien, lease, rent, let, give or otherwise
dispose of said land or any part thereof to
any person whatsoever. And should the State
of Texas hereafter provide a home for said
tribe of Indians, and settle them thereon,
then the said twelve hundred and eighty acres
of land, with its improvements, shall become
the property of the State." (Emphasis added)

From the quoted Section of the Act, it is apparent
that the Indians received less than a fee simple estate in the
lands. There are specific restrictions imposed on the Indians,
which bar any conveyance or lease by them of this land or any
part thereof, and further their possession and enjoyment of the
lands are dependent upon the Legislature as evidenced by the
quoted language. The reversionary interest is in the State of
Texas and should the Legislature see fit to provide a lawful
procedure for leasing these lands, it could do so.

In 1928, the Indian Reservation was enlarged when an
adjacent tract of 3,071 acres was purchased by the United States
"in trust for the Alabama and Coushatta Indians of Texas." Under
Public Law 627, Acts of 83rd Congress, 1954, 68 Stat. 768, 25
U.S.C.A., Secs. 721 et. seq., the Federal Government was au-
thorized to deed said tract to the State of Texas, to be held
by it "in trust for the benefit of the Alabama and Coushatta

Tribes of Texas, subject to such conditions regarding management and use as the State of Texas may prescribe and the disposition of such lands shall be subject to approval of a majority of the adult members of the Alabama and Coushatta Tribes of Texas." (Emphasis added.) Thus Congress terminated Federal supervision over the tribe.

In anticipation of the adoption of Public Law 627, the Texas Legislature adopted Senate Concurrent Resolution No. 31 (Acts 1953, R.S., p. 1078) authorizing the Governor to accept on behalf of the State a transfer of the trust responsibilities of the United States respecting the lands and other assets of said tribes, and providing further:

"That the Governor is authorized to designate the State agency in which such trust responsibilities shall rest, and the agency so designated shall have authority to promulgate rules and regulations for the administration of the trust and the protection of the beneficial interests of the Indians in such lands and other assets." (Emphasis added)

The Board for Texas State Hospitals and Special Schools was designated by Governor Allen Shivers as the agency to administer the trust.

Section 2 of Article 3174b, Vernon's Civil Statutes, provides in part:

". . .Effective September 1, 1949, the control and management of, and all rights, privileges, powers, and duties incident thereto including building, design and construction of the Texas State Hospitals and Special Schools which are now vested in, and exercised by the State Board of Control shall be transferred to, vested in, and exercised by the Board for the Texas State Hospitals and Special Schools. . . ."

Section 3 of Article 3174b, Vernon's Civil Statutes, provides:

"Section 3. The term 'Texas State Hospitals and Special Schools' as used in this Act shall mean . . .The Alabama Coushatti Indian Reservation, Livingston, Texas . . . and all other institutions

heretofore or hereafter referred to as 'eleemosynary
institutions' or 'hospitals and special schools.'
"
. . .

House Bill No. 1096, Acts 59th Legislature, 1965,
Ch. 279, p. 552, codified as Article 5421z, Vernon's Civil
Statutes, which creates the Commission for Indian Affairs, pro-
vides as follows in Section 8:

"Section 8. All powers, duties, and func-
tions with respect to the supervision, management,
and control of the Alabama-Coushatta Indian Reserva-
tion, previously vested in the Board of Texas State
Hospitals and Special Schools, and all appropriated
balances, property, personnel, and records used
by the Board in conjuction with such powers,
duties, and functions are transferred to the
Commission for Indian Affairs."

Section 14 of House Bill No. 1096 provides:

"Section 14. All bonds issued by the
Tribal Council shall mature serially or other-
wise not more than 25 years from the date of
issuance, . . ." (Emphasis added).

Section 15 of House Bill No. 1096 provides:

"Section 15. Subject to the restrictions
contained in this act, the Tribal Council and
the Commission have complete discretion in fixing
the form, conditions, and details of the bonds;
. . ." (Emphasis added).

Any discussion of the powers and duties of the Commis-
sion for Indian Affairs would not be complete without stating
that the Commission must have express authority to issue bonds
and other negotiable securities, and this is not a power that
may be implied. In this connection, in Lasater v. Lopez, 110
Tex. 179, 217 S.W. 373, 376 (1919), the Supreme Court said:

"Without special authority, a court charged
with the administration of the business affairs
of a county is without the power to issue
negotiable securities, depriving the county of
true defenses against the original creditor.
It is not a power to be implied. It does not
exist unless expressly conferred by law. Such

is the established doctrine in this State,
and has been from an early time." (Emphasis
added)

As set forth in Attorney General's Opinion C-520, the control and management of the affairs and property of eleemosynary institutions established by law were vested in the Board for Texas State Hospitals and Special Schools. Control and management of building construction on the Alabama-Coushatta Reservation was vested in the Board for Texas State Hospitals and Special Schools by virtue of Section 2 of Article 3174b. Section 8 of House Bill No. 1096 transfers control and management of building construction to the Commission for Indian Affairs as the Commission's primary responsibility is the development of the human and economic resources of the Indian Reservation.

It is our opinion that the express authority to issue public bonds and other negotiable securities by the Commission is governed by Sections 13, 14, 15 and 16 of House Bill No. 1096. Section 14 of House Bill No. 1096 specifically states the maturity of all bonds issued is to be not more than twenty-five years from the date of issuance. The Commission's power does not exist unless expressly conferred by law. The Commission must operate within the framework of the express authority to issue bonds and cannot do indirectly what it may not do directly. The Tribal Council may issue revenue bonds or any other evidence of indebtedness only after having obtained the written approval of the Commission. Therefore, the Tribal Members cannot create a Public Housing Authority as a separate corporate entity to which the Commission and the Tribal Council could make a forty-year lease of State Trust Land to develop a low-rent housing project.

### SUMMARY

The Alabama-Coushatta Indian Tribal Members cannot create a Public Housing Authority as a separate corporate entity to which the Commission for Indian Affairs and the Alabama-Coushatta Indian Tribal Members could make a forty-year lease of State Trust Land to develop a low-rent housing project.

Very truly yours,

WAGGONER CARR
Attorney General

By: Alan Minter

Alan Minter
Assistant

AM:ra:mkh

APPROVED:
OPINION COMMITTEE

W. V. Geppert, Chairman
Pat Bailey
Arthur Sandlin
Ben Harrison
Malcolm Quick

APPROVED FOR THE ATTORNEY GENERAL
BY:  T. B. Wright